IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI-DADE DIVISION

SHAWNIELL HARRELL
CHANEL THOMPSON,

Plaintiff,

vs.

AQUA VISTA TOWNHOMES CONDOMINIUM ASSOCIATION, INC.;
A Florida non-profit corporation,

Defendant.

_____/

## COMPLAINT

### INTRODUCTION

1. The Harrell family is an African-American family participating in the Section 8 Housing Choice Voucher Program ("Section 8") and renting a condominium unit at the Aqua Vista Townhomes Condominium Association ("Aqua Vista"). Through its President, Daniella Adams, Aqua Vista has discriminated against the Harrell family because of their race and has intimidated, threatened and interfered with the Harrell's right to rent housing without regard to their race. The Harrell family seeks declaratory judgment, permanent injunctive relief, and damages.

### JURISDICTION AND VENUE

2. The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 3613, because this lawsuit is brought under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

3. Venue is proper in the Southern District of Florida, Miami Division, under 28 U.S.C. § 1391(b) and 1391(c) because the claim arose in this district and Defendant conducts business in this district.

## PARTIES

4. Plaintiff, Shawniell Harrell, ("Ms. Harrell") is an African-American citizen of the United States and resident of Miami, Florida. Ms. Harrell has three children, Chanel Thompson (20), Mark Louis-Charles (16), and Marshell Louis-Charles (2). Ms. Harrell resides at 2066 NE 167th Street, Apt. 4, Miami, Florida.

5. Plaintiff Chanel Thompson ("Ms. Thompson") is 20 years old and attends Florida Career College's Medical Assistant Program. Ms. Thompson resides at 2066 NE 167th Street, Apt. 4, Miami, Florida.

6. Collectively, the Plaintiffs will be referred to as the Harrell family.

7. The Defendant, Aqua Vista Townhomes Condominium Association, Inc. ("Aqua Vista") is a Florida non-profit corporation, licensed to and doing business in Miami-Dade County, Florida.

8. Daniella Adams (hereinafter "Ms. Adams") is the President of the Board of Directors of Aqua Vista and manages the day-to-day operations for Aqua Vista.

## FACTS

9. Aqua Vista is a townhome community in North Miami Beach with 95 units on separate lots located on NE 167th Street between NE 19th and 22nd Avenues.

10. Plaintiffs have lived at Aqua Vista for the past 8 years.

11. Plaintiffs originally lived in the unit located at 2048 NE 167th Street, but they were required to move after the unit was sold at a foreclosure sale.

12. In January 2010, Ms. Harrell rented the unit where she currently lives located at 2066 NE 167th Street, Apt. 4, Miami, Florida 33162.

13. Ms. Harrell rents the unit from Ivonne Aznarez.

14. In order to afford the rent, Ms. Harrell uses a Section 8 Housing Choice Voucher.

15. The Section 8 Housing Choice Voucher Program is a federal government program created to assist low-income families, the elderly, and the disabled afford housing in the private rental market.

16. Ms. Harrell has been a Section 8 participant since approximately May 1993.

17. In the Section 8 program, the public housing authority pays a housing subsidy directly to the landlord and the Section 8 participant pays a portion of the rent based on her income.

18. Daniella Adams owns a unit at Aqua Vista and, since 2008, serves as the President of Aqua Vista's Board of Directors and manages Aqua Vista's day-to-day operations.

19. At all times alleged in this complaint, Ms. Adams acted on behalf of Aqua Vista and in her capacity as President.

20. In her capacity as President of Aqua Vista, Ms. Adams stated to some unit owners that she wants to remove African American and Hispanic tenants, as well as any tenants using a Section 8 voucher.

21. On December 17, 2012, Aqua Vista sent Ivonne Aznarez, Plaintiff's landlord, a letter stating that Aqua Vista's property insurance policy would increase due to Ms. Harrell's participation in the Section 8 voucher program. Aqua Vista's letter said that the tenants must

move out or give up their Section 8 housing assistance. A copy of this letter is attached as Plaintiff's Exhibit A.

22.  On January 4, 2013, Ms. Adams and her assistant delivered a letter from Aqua Vista to Ms. Harrell.

23.  While standing outside Ms. Harrell's door, Ms. Adams told her assistant, "These people need to be spoken to rudely because of the way they act. You have to handle them that way."

24.  The letter from Aqua Vista stated that the association's insurance would increase due to Ms. Harrell's participation in the Section 8 voucher program. A copy of this letter is attached as Plaintiff's Exhibit B.

25.  Aqua Vista's letter stated that Ms. Harrell could remain living at Aqua Vista if she were to give up her Section 8 voucher, knowing that this would make the rent unaffordable for the family and make the housing unavailable.

26.  The January 4, 2013, letter stated that Aqua Vista felt that Ms. Harrell and her family should move out: "we feel that perhaps your family would be better suited to living elsewhere." *See* Exhibit B.

27.  Aqua Vista's letter also suggested that other residents had problems with Ms. Harrell, but it did not identify any specific complaints.

28.  Aqua Vista's letter mentioned a "BB gun event" but this refers to an incident where a maintenance man believed Ms. Harrell's son was holding a gun, when in fact he was holding a paintball gun.

29. Aqua Vista's letter tries to intimidate the Harrell family by saying it would publicize the matter to all owners and contact government agencies if the Harrells did not respond to Aqua Vista's demands. *See* Exhibit B.

30. For at least the past two years, Aqua Vista used the same insurance carrier without any issues related to tenants receiving Section 8 housing assistance.

31. On April 3, 2013, Aqua Vista renewed its insurance policy and there was no increase in the cost of its general liability insurance because of the presence of Section 8 tenants.

32. Ms. Adams, acting in her capacity as President of Aqua Vista, consistently intimidates the Harrell family through her words and actions.

33. Ms. Adams regularly harasses the Harrell family and their guests with the purpose of intimidating the Harrell family.

34. In mid-2012, Ms. Thompson and an African-American and Hispanic friend were using the Aqua Vista community pool. Ms. Adams came to the pool and yelled at Ms. Thompson for having more than one guest at the pool. During this encounter, Ms. Adams stated that she would call Section 8 and have the Harrell family removed from the Section 8 program.

35. On October 31, 2012, Ms. Adams came up to Ms. Thompson and her brother and berated them for sitting on Ms. Harrell's car. Ms. Adams yelled in a demeaning manner: "Get off the car, you don't belong there."

36. During Thanksgiving and Christmas 2012, when the Harrell's African-American family members came to visit, Ms. Adams would stop them at the front gate and question why they were at the property.

37.     In January 2013, Ms. Adams yelled and screamed at Ms. Thompson because she did not close the gate properly.  Ms. Adams stated, "Take your ass back to close the gate. I don't know how many times I have to tell y'all black asses to close the gate."

38.     In September 2013, Ms. Thompson and two friends were using the pool and Ms. Adams came to the pool and yelled at Ms. Thompson because she was not wearing appropriate attire, even though she was wearing a two-piece bathing suit.

39.     As a result of Aqua Vista's actions and harassment, the Harrell family has suffered, is continuing to suffer, and will in the future suffer, great and irreparable loss and injury, including, but not limited to, humiliation, embarrassment, emotional distress, and a deprivation of their right to equal housing opportunities regardless of race.

40.     By engaging in the unlawful conduct described above, Aqua Vista acted intentionally and maliciously to damage the rights and feelings of the Harrell family in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601, et seq.

## COUNT I -- INTERFERENCE, COERCION, OR INTIMIDATION
## VIOLATION OF 42 U.S.C. § 3617

41.     Plaintiffs reallege the allegations in paragraphs 9 through 40.

42.     The Fair Housing Act prohibits the use of coercion, intimidation, threats, or interference with any person in the exercise or enjoyment of any rights granted by the Act. *See* 42 U.S.C. § 3617.

43.     The Harrell family is African-American and a member of a protected class.

44. The Harrell family seeks to rent their dwelling without regard for their race, and to benefit from the terms, conditions, and privileges of living at Aqua Vista without regard to their race.

45. Aqua Vista coerced, threatened, intimidated, and interfered with the Harrell family's ability to rent their dwelling unit because of their race.

46. Aqua Vista coerced, threatened, intimidated, and interfered with the Harrell family's terms, conditions, and privileges, of living at Aqua Vista because of their race.

47. Aqua Vista intended to discriminate against the Harrell family.

48. Aqua Vista acted intentionally and in total disregard of the Harrell family's federally protected rights.

49. Aqua Vista is liable for violations of Plaintiffs' rights under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3617.

## COUNT II – DISCRIMINATION IN RENTAL OF HOUSING
## VIOLATION OF 42 U.S.C. § 3604

50. Plaintiffs reallege the allegations in paragraphs 9 through 40 of the Complaint.

51. The Fair Housing Act makes it unlawful to refuse to rent a dwelling or otherwise make the unit unavailable to any person because of their race. *See* 42 U.S.C. § 3604(a).

52. The Fair Housing Act makes it unlawful to discriminate against any person in the terms, conditions, privileges, services, or facilities of a dwelling because of race. *See* 42 U.S.C. § 3604(b).

53. Aqua Vista attempted to prevent the Harrell family from continuing to rent a unit at Aqua Vista because of their race.

7

54. Aqua Vista tried to make the Harrell's unit unavailable because of their race by telling Ms. Harrell she must move out or give up her Section 8 voucher.

55. Aqua Vista discriminated against the Harrell family because of their race in the terms, conditions, privileges, services, and facilities at Aqua Vista.

56. Aqua Vista acted intentionally and in total disregard of the Harrell family's federally protected rights.

57. Aqua Vista is liable for violations of Plaintiffs' rights under the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3604.

## JURY DEMAND

58. In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in the above case.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests this Court to:

A. Declare the Defendant's actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §3604 and §3617;

B. Enter permanent injunctive relief enjoining Defendant, its agents, employees, and successors from discriminating on the basis of race or color in violation of the Fair Housing Act of 1968 and requiring Defendant to take appropriate affirmative action to ensure that the activities complained of above are not engaged in again by them or any of their agents;

C. Grant Plaintiffs judgment against Defendant for actual and punitive damages pursuant to 42 U.S.C. § 3613(c)(1);

D.	Grant Plaintiffs' attorney's fees pursuant to 42 U.S.C. § 3613(c)(2) in an amount based on the reasonable expenditure of time and hourly fee of their attorneys;

E.	Award Plaintiffs' court costs; and

F.	Award Plaintiff such other relief as the Court deems just and proper.

Respectfully submitted,

LEGAL SERVICES OF GREATER MIAMI, INC.

and

UNIVERSITY OF MIAMI SCHOOL OF LAW
TENANTS' RIGHTS CLINIC

By _____

Jeffrey M. Hearne, Esq.
Florida Bar No. 512060
Legal Services of Greater Miami, Inc.
3000 Biscayne Blvd., Suite 500
Miami, FL 33137
Telephone: (305) 438-2403
Facsimile: (305) 573-5800
Email: jhearne@lsgmi.org
Attorneys for Plaintiffs

2066-4

Aqua Vista Townhomes Condominium Association, Inc.
2078 N.E. 167th Street, Suite 1, North Miami Beach, FL  33162
Tel: 305-944-8808 Fax: 305-944-8908 Email: aquavistanmb@yahoo.com

December 17th, 2012

Dear Ms. Aznarez:

We are writing to you about an important insurance issue that was brought to the association's attention recently by our insurance company.

The president of Mack, Mack and Waltz has advised us that in order for the renewal of our primary property (fire, hazard, umbrella, liability) polices to continue with a preferred (admitted) carrier at the current discounted rates, we will need to confirm shortly that there are no subsidized housing rentals in the complex going forward.

The impact of not complying with this recommendation is that we will be cancelled by our current insurance carrier which falls under the most desirable and affordable category of coverage. We will then have to contract with a second tiered (surplus) carrier at significantly higher cost of 30-50% and increased exposure.

Coverage thru an admitted company is regulated and backed up by the State and funding is guaranteed. Surplus coverage is not. This is an important issue should the company not be able to pay a claim. **The State Insurance Guaranteed Fund does not cover policies written by surplus carriers. As a result, Aqua Vista owners would be individually responsible for any losses which would be an unacceptable exposure.**

Currently out of 95 units, there are two that we have confirmed as receiving government assistance with their housing. You are one of them.

Not addressing this recommendation will adversely impact the association by redirecting substantial funds to pay unnecessary increased insurance costs for inferior coverage. The association and its board of directors must make decisions based upon what is for the greater good of the majority of its owners.

The impact of having subsidized housing rentals is presently of benefit to only two owners. All the other owners are being asked to bear the burden of a substantial cost increase that is of benefit to only two owners. This is an inequitable use of association resources.

This situation cannot continue. The renewal of our insurance is in March. It will be necessary to confirm that your tenants have either moved out by that time or can confirm that they are no longer receiving subsidized housing assistance which the association must be able to independently verify with the appropriate authorities.



PLAINTIFF'S EXHIBIT A

From the perspective of the insurance carriers, subsidized housing units have a higher loss ratio than non-subsidized ones. The other prohibited categories that the insurance industry targets as being high risk exposure are the following: student housing, nursing homes, senior housing, hotel like exposures (short term rentals) and low income housing.

We have already been exposed to serious liability situations in the past involving some of these categories and it is the association's responsibility to take measures to reduce risk concerns while maintaining the best insurance coverage possible.

Please refer to the attached letter by Paul Mack, President of Mack, Mack, and Waltz, as well as a sample Insurance application used by admitted carriers that he provided. Please refer to the section entitled "Prohibited Exposures" on page two.

We trust that you will take the necessary measures to mitigate aqua vista's exposure, as well as reduce the increased financial burden that would need to be carried by the other owners.

On behalf of the Association,  
The Board of Directors

Sent by Regular and Certified Mail at same time



December 13, 2012

Aqua Vista Townhomes Condominium Association, Inc.
2078 NE 167 Street, #1
North Miami Beach, FL 33162

RE: Section 8 Housing

Dear Aqua Vista Board,

The admitted carriers in your program do not allow ANY subsidized housing exposure in your association. If this risk is present, they will likely cancel coverage and force you into the substandard market. This will cause an estimated increase in insurance costs of 25 to 50 percent. We also anticipate a decrease in coverage.

Let me know if you have any questions.

Best Regards,

Paul M. Mack, CIC, AAI, CRM



Program Manager:
McGowan & Company, Inc.
Home Office – 20595 Lorain Road
Fairview Park, OH 44126
Phone: (440) 333-6300 / Fax: (440) 333-3214
www.mcgowaninsurance.com

Submitted By:
Agency: _____
Address: _____
_____
Contact: _____
Phone/Fax: (___)___-___  (___)___-___
E-Mail: _____

## "Common Assurance" Umbrella Program
### Application for Insurance & Purchasing Group Membership

### Applicant Information Section & General Information

Applicant: _____

Mailing address: _____

Insured is:
- ☐ Condominium association   ☐ Townhome Association   ☐ Planned Unit Development
- ☐ Cooperative   ☐ Timeshare Condominium Association   ☐ Commercial Association
- ☐ Master Association   ☐ Single-Family Home HOA / POA   ☐ Condo-Hotel

   o  We consider PUDs to be associations with municipality-like exposures (police, fire, medical, water treatment, etc.)

Limits requested:   ☐ $5MM   ☐ $10MM   ☐ $15MM   ☐ $20MM   ☐ $25MM

Web site address: www._____ . _____

### Ratable Exposures – General Liability & Liquor Liability
*Blanks will be interpreted as "0."*

| | | | |
|---|---|---|---|
| # Condominium-style units - In bldgs. 3 stories or less: | _____ | Commercial exposure (in square feet): | _____ |
| # Condominium-style units - In bldgs. 4 – 9 stories: | _____ | # Swimming pools: | _____ |
| # Condominium-style units - In bldgs. 10 or more stories: | _____ | Liquor sales: | $_____ |
| # Single-family home HOA/PUD/POA units: | _____ | Food sales: | $_____ |

### Ratable Exposures & Information – Automobile Liability
*Blanks will be interpreted as "0."*

Vehicle Counts:  PPT: _____   Light: _____   Medium: _____   Heavy: _____   Other: _____

Is there a valet service?   ☐ Yes   ☐ No

### Directors & Officers Liability

1. Has Applicant had more than one D&O claim in the last three (3) years?   1. ☐ Yes ☐ No
2. Has Applicant been in existence for less than one (1) year?   2. ☐ Yes ☐ No
3. Is the developer on the board of directors?   3. ☐ Yes ☐ No
4. Is the occupancy rate less than 75%?   4. ☐ Yes ☐ No
5. Is there a negative fund balance?   5. ☐ Yes ☐ No

### Loss Experience – Policy Year Aggregate Losses
*Blanks will be interpreted as "0."*

For each year, please indicate the "Incurred" losses (i.e. - Paid + Reserved).

☐ No claims in past five (5) years. Please move on to the next section.

| | Current Year: | First Prior: | Second Prior: | Third Prior: | Fourth Prior: |
|---|---|---|---|---|---|
| General Liability: | $ | $ | $ | $ | $ |
| Automobile Liability: | $ | $ | $ | $ | $ |
| D&O / EPL Liability: | $ | $ | $ | $ | $ |

Note: Three years of loss runs are required, but aggregate loss information must be summarized above; please do not write "See Attached" in the fields above.

## Underlying Insurance Program

| Policy Type: | Insurer & Policy #: | Limits: | Premium: | Policy Period: |
|---|---|---|---|---|
| General Liability | Insurer: _____ Pol. #: _____ | __ MM / __ MM | $_____ | __/__/____ - __/__/____ |
| Automobile Liability / H&NO Auto | Insurer: _____ Pol. #: _____ | __ MM | $_____ | __/__/____ - __/__/____ |
| Employers Liability | Insurer: _____ Pol. #: _____ | __ K / __ K / __ K | $_____ | __/__/____ - __/__/____ |
| D&O / EPL Liability | Insurer: _____ Pol. #: _____ | __ MM | $_____ | __/__/____ - __/__/____ |
| Other: _____ | Insurer: _____ Pol. #: _____ | __ MM / __ MM | $_____ | __/__/____ - __/__/____ |

Does the primary Automobile Liability or General Liability policy cover Hired & Non-Owned? ☐ Yes ☐ No

Insured agrees that it will comply with the following underlying insurance requirements:

- General Liability policies must: (a) contain an endorsement or policy language which provides for Defense Costs Outside The Limits; and, (b) with regards multiple-location risks, provide coverage on an "Aggregates Per Location" Basis.

- The following underlying policies must be written on an "Occurrence"-form basis: General Liability; Automobile Liability; and, Employers Liability.

- The following underlying policies must be written on an "Claims-Made"-form basis: Directors & Officers Liability; Employee Benefits Liability

## Expiring Umbrella

Current Umbrella   Carrier: _____   Limit: $ ____ MM   Premium: $ _____

Renewal Quotes   Option #1:   Carrier: _____   Limit: $ ____ MM   Premium: $ _____
                 Option #2:   Carrier: _____   Limit: $ ____ MM   Premium: $ _____

## Named Insureds

Please list exact legal names of entities to be insured. (Property managers, directors, and officers do not need to be listed, as our policy provides automatic coverage for property managers, directors, and officers.)

1. _____
2. _____

## Location Information

If there are additional locations, please provide us with a spreadsheet summarizing the information below.

Address: _____

Construction Type: ☐ Frame   ☐ JM   ☐ Masonry   ☐ Non-Combustible   ☐ Fire Resistive

# Stories: ___   # Units: _____   Year Of Construction: _____   Average Unit Value: _____

Sprinkler status:   ☐ 100%   ☐ Partial (All common areas)   ☐ Not sprinklered

## Prohibited Exposures

Please indicate if Applicant has any of the following prohibited exposures:

- ☐ Bldgs. in the Bronx, NY
- ☐ Subsidized housing
- ☐ Low-income housing
- ☐ Vacant buildings
- ☐ Hotel-like exposures
- ☐ Student housing
- ☐ Nursing home, nursing care, extended care, or assisted living
- ☐ Locations at which meals are served to residents
- ☐ Senior housing (not including "55+" age-restricted communities)
- ☐ Locations owned or operated by nonprofit entities with a charitable purpose (e.g. – locations for the elderly or infirm owned by religious or charitable organizations)
- ☐ Associations which rent units to "spring breakers"

## Miscellaneous Exposures

1. Does Applicant have <u>security guards</u>?
   (If "Yes," please complete our "Security Guard Supplemental.")   1. ☐ Yes ☐ No

2. Does Applicant have written by-laws?   2. ☐ Yes ☐ No

3. Is the <u>owner</u> occupancy rate less than 75%?
   (Not applicable to single-family home HOAs, PUDs, P.O.A.s, or Single-Family HOAs)
   (If "Yes," please complete our "Rental Units Supplemental.")   3. ☐ Yes ☐ No ☐ N/A

   If "Yes", what percentage of the units are rented? _____ %

4. Is the property 100% built-out?   4. ☐ Yes ☐ No
   If "No", what percentage of the property is built-out? _____ %

5. Are at least 90% of the units sold?   5. ☐ Yes ☐ No
   If "No", what percentage of the units are sold? _____ %

6. Are there any other exposures of which we should be aware? (e.g. – golf courses, equestrian   6. ☐ Yes ☐ No
   exposures, skate parks, aviation exposures, etc.)
   If "Yes," please provide details: _____

## Marine Exposures

Are there any of the following exposures?

☐ Docks   ☐ Piers   ☐ Marinas   ☐ Dams   ☐ Beaches
☐ Boat slips   ☐ Watercraft   ☐ Marina exposures   ☐ Lakes or ponds

If there are dams, please complete our "Dam Supplemental."
If there are lakes, ponds, or beaches, please complete our "Lakes, Ponds & Beaches Supplemental."
If there are watercraft, please complete our "Watercraft Supplemental."
If there are marina exposures, please complete our "Marina Supplemental."

## Life Safety – All Associations

All Applicants must answer the following questions.

1. Are there any outstanding <u>mandatory</u> (a.k.a. - "Critical") loss control recommendations?   1. ☐ Yes ☐ No

2. <u>Pool Questions</u>   ☐ Not applicable – Insured does not have a pool

   (a) Are all pool areas fenced with self-closing/self-latching gates in working order?   2. (a) ☐ Yes ☐ No
   (b) Do all pool areas contain "Swim At Your Own Risk" signs and depth markers?   2. (b) ☐ Yes ☐ No
   (c) Are the hours of operation posted?   2. (c) ☐ Yes ☐ No
   (d) Are there any <u>diving boards</u>?   2. (d) ☐ Yes ☐ No
   (e) Are there any <u>slides</u>?   2. (e) ☐ Yes ☐ No
   (f) Are there any other water features, such as "lazy rivers," wave pools, water parks, etc.   2. (f) ☐ Yes ☐ No
   (g) Do all pools have <u>anti-vortex drains</u> and drain covers?   2. (g) ☐ Yes ☐ No

## Life Safety – Condominium-Style Associations

Only condominium-style associations should answer the questions in this section.

1. <u>Smoke Detector</u> Questions -   Type: ☐ Battery-Powered   ☐ Hard-Wired

   (a) Annual maintenance program for battery-powered detectors to ensure proper functioning?   1. (a) ☐ Yes ☐ No ☐ N/A

2. Do all buildings comply with <u>local and state ordinances</u>?   2. ☐ Yes ☐ No

3. Buildings With <u>Interior Corridors</u> (NFPA 101 Questions)   ☐ Not applicable – Bldgs. do not have interior corridors

   (a) Do corridors contain lighted exit signs and emergency lighting that illuminates means of egress?   3. (a) ☐ Yes ☐ No
   (b) Are the emergency lighting systems tested as least once (1x) annually?   3. (b) ☐ Yes ☐ No
   (c) Are exit signs clearly marked?   3. (c) ☐ Yes ☐ No
   (d) Are there two (2) means of egress per floor?   3. (d) ☐ Yes ☐ No
   (e) Are all exit doors unlocked and unobstructed?   3. (e) ☐ Yes ☐ No
   (f) Are all exit doors leading into stairwells fire-rated?   3. (f) ☐ Yes ☐ No

4. Has a GL carrier inspected all bldgs. *in excess* of <u>seven</u> (7) stories in the past 3 years?  4. ☐ Yes ☐ No ☐ N/A

5. Do all buildings more than one (1) story in height with decks, porches, or balconies above the first floor comply with all local and state building codes (i.e. – permit specifications, inspection requirements, etc.)  5. ☐ Yes ☐ No ☐ N/A

## Life Safety – Single-Family Home HOAs / PUDs

Only single-family home HOAs, PUDs, and POAs should answer the questions in this section.

1. Units are located in:   ☐ Freestanding individual units   ☐ Multiple-unit buildings

2. Streets are:  ☐ Public  ☐ Private   If private, how many miles? _____

## Uninsured & Underinsured Motorists Liability Coverage Options Selector

☐   I <u>decline</u> to purchase Uninsured and Underinsured Motorists Liability coverage. I understand that I or the organization which I represent will have no Uninsured or Underinsured Motorists Liability coverage.

☐   I <u>would like</u> to purchase Uninsured and Underinsured Motorists Liability coverage. I understand that I or the organization which I represent will be surcharged $50,000.00 for this coverage.

## Terrorism Liability Options Selector

☐   I <u>decline</u> to purchase Terrorism Liability coverage. I understand that I or the organization which I represent will have no coverage for losses arising from acts of terrorism.

☐   I <u>would like</u> to purchase Terrorism Liability coverage. I understand that I or the organization which I represent will be surcharged 2% for this coverage.

## Anti-Fraud Agreement, Insurance Terms & Conditions & Agreement, Membership Terms & Conditions (Including Fee Disclosure) & Agreement

The Undersigned Insurance Broker And Applicant Declare That To The Best Of Their Knowledge And Belief And Warrant That The Statements Set Forth Herein Are True. The Undersigned Further Declares That Any Occurrence Or Event Taking Place Prior To The Effective Date Of The Insurance Applied For Which May Render Inaccurate, Untrue, Or Incomplete Any Statement Made Will Immediately Be Reported In Writing To The Insurer And The Insurer May Withdraw Or Modify Any Outstanding Quotations And/Or Authorization Or Agreement To Bind The Insurance. The Insurer Is Hereby Authorized, But Not Required, To Make Any Investigation And Inquiry In Connection With The Information, Statements And Disclosures Provided In This Application, The Decision Of The Insurer Not To Make Or To Limit Any Investigation Or Inquiry Shall Not Be Deemed A Waiver Of Any Rights By The Insurer And Shall Not Stop The Insurer From Relying On Any Statement In This Application In The Event The Policy Is Issued. Any Person Who Knowingly And With Intent To Defraud Any Insurance Company Or Other Person Files An Application For Insurance Containing False Information Concerning Any Material Fact Thereto, Or Conceals Information For The Purpose Of Misleading, Commits A Fraudulent Insurance Act, Which Is A Crime.

Purpose & Effect Of "Application For Insurance & Purchasing Group Membership." By Signing This "Application For Insurance & Purchasing Group Membership" (Hereinafter "Application"), Applicant Agrees: (1) To Become A Member Of Community Associations PG, Inc. (Hereinafter "PG"); (2) To Participate In A Program Of Insurance Designed Exclusively For The Members Of PG; (3) To Accept, Abide By, And Be Bound By The "Terms & Conditions Of Insurance" Posted At www.purchasinggroups.com; (4) To Accept, Abide By, And Be Bound By The "Membership Agreement – Terms & Conditions Of Membership" Posted At www.purchasinggroups.com; (5) To Pay All Premiums (Including Audit And Additional Premiums, If Applicable), Fees (Including Broker & Purchasing Group Membership Fees), And State & Federal Taxes & Surcharges (If Applicable) When Due; (6) That Any Additional Material Supplied By Applicant Or Applicant's Insurance Broker To The Managing General Underwriter For A Given Program Of Insurance Becomes A Material Part Of The Application For Insurance; (7) That This Application Which It Signs Is The Basis Of The Contract [Policy &/Or "Evidence Of Insurance & Purchasing Group Membership" (Hereinafter "EOI")], Whether Or Not Said Application Is Attached To The Policy &/Or EOI; (8) That This Application Is A <u>Material Part</u> Of The Policy &/Or EOI, Whether Or Not It Is Attached To The Policy &/Or EOI; And, (9) That This Application Is <u>Considered Attached</u> To The Policy &/Or EOI For Legal Purposes, Whether Or Not It Is Physically Or Electronically Attached To The Policy &/Or EOI.

Disclosure Regarding Shared Limits. Members Do <u>Not</u> Share Limits And Each Member Is Provided With Its Own Policy &/Or EOI.

Disclosure Pursuant To Federal Law Regarding Purchasing Groups [U.S.C. 15 3901, Et Seq.] PG Is A "Purchasing Group," As Defined Under Federal Law, Formed To Purchase Liability Insurance On A Group Basis For Its Members To Cover The Similar Or Related Liability Exposure(s) To Which The Members Of PG Are Exposed By Virtue Of Their Related, Similar, Or Common Business Or Service. Members Do <u>Not</u> Share Limits And Each Member Is Provided With Its Own Policy &/Or EOI.

Disclosure Pursuant To Terrorism Risk Insurance Act Of 2002. By Signing Below, Applicant Agrees That It Has Read And Understands The "Disclosure Pursuant To The Terrorism Risk Insurance Act Of 2002" Which Appears At www.purchasinggroups.com.

To Learn More. Please Visit www.purchasinggroups.com, Which Contains More Information About Your Purchasing Group And Purchasing Groups, In General, As Well As Your Insurance Coverage, Premiums, Fees, Taxes, The MGUs' Income, And Your Insurance Broker's Income.

_____  _____, 20___     _____  _____, 20___
Signature of Applicant    Date              Signature of Insurance Broker    Date
Print Name: _____                  Print Name: _____
Title: _____                       Title: Insurance Broker

"Common Assurance" Umbrella Program [McGowan & Company, Inc. ©]

4

Aqua Vista Townhomes Condominium Association, Inc.

2078 N.E. 167th Street, Suite 1, North Miami Beach, FL  33162

January 4th, 2013

Dear Ms. Harrell:

As the person named on the lease for unit 2066-4, the association needs to make you aware of the following at this time:

- Per the attached documents that have been sent to your landlord already, the renewal of your lease which is set to expire shortly cannot occur unless certain conditions have changed. The primary one relates to your being a recipient of subsidized housing funds. Our insurance agent has advised the association that subsidized housing is a prohibited category under the insurance questionnaire. Having residents who fall under this category would result in the loss of our preferred (admitted carrier) insurance coverage, as well as a substantial increase in insurance costs with an inferior (surplus) carrier. This would increase the association's exposure and liability and the added cost would be passed on to all the unit owners in increased maintenance dues.
- If you wish to continue residing at Aqua Vista, it will be necessary that you relinquish the government rental subsidy that you are currently receiving. We will need written proof of this, as well as agency contact information in order to independently verify this information.
- Of concern to the association are several other ongoing issues that have occurred over the last few years. Starting with the BB gun event that necessitated a police visit to the complex, along with numerous complaints that have been made by other residents concerning specific behavior issues on the complex directly associated with your unit, we feel that perhaps your family would be better suited living elsewhere. We were recently notified by authorities concerning a general problem with the ongoing use of mailboxes that correspond to non-occupied units in the area. This is a violation of postal



PLAINTIFF'S EXHIBIT B

regulations. We were advised to change the lock on any mailboxes where this might be an issue. We understand that your former rental address was one of the units addressed.

➢ We need confirmation of your intentions in this matter as soon as possible because the insurance is renewing in March. Should we not get a timely response from you, the association in its efforts to protect the interests of all the owners is prepared to contact the appropriate government agencies to address all our concerns, as well as publicize this matter to all the owners who would be directly affected.

The Board of Directors,
On Behalf of the Association